UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC HERNANDEZ,<br><br>    Petitioner,<br><br>v.<br><br>KATHLEEN ALLISON,<br><br>    Respondent. | No. 2:22-cv-2274-TLN-SCR<br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is an incarcerated individual proceeding through counsel in this habeas corpus action filed pursuant to 28 U.S.C. § 2254.[1] Petitioner challenges his 2019 conviction for criminal threats, injuring a former cohabitant, driving or taking a vehicle without consent, and two misdemeanor counts of vandalism. Upon consideration of the record and the applicable law, the undersigned recommends denying petitioner's habeas corpus application on the merits.

**I.    Factual and Procedural History**

On November 28, 2018, a criminal complaint filed in Amador County Superior Court initially charged petitioner with three separate felonies and two misdemeanors. ECF No. 8-3 at 12-15. Following a preliminary hearing, a criminal information filed on December 20, 2018 charged him with five felonies and two misdemeanors. ECF No. 8-3 at 26-30. After a jury trial,

---

[1] The habeas petition was filed pro se, but counsel entered his appearance on behalf of petitioner on June 2, 2023 before filing a traverse. See ECF No. 10.

1

petitioner was convicted of making criminal threats, injuring his girlfriend, driving or taking a vehicle without consent, all felonies, and two misdemeanor counts of vandalism. ECF No. 8-3 at 141, 150-151, 153, 155 (verdict forms). The jury acquitted petitioner of second degree burglary of a vehicle and a separate count of injuring his girlfriend. ECF No. 8-3 at 152, 154. The court sentenced petitioner to an indeterminate term of 25 years to life. ECF No. 8-3 at 191-194 (Felony Abstract of Judgment). The misdemeanor sentences were run concurrently to the felony term. ECF No. 8-3 at 195.

Petitioner does not contest the state courts' recitation of facts nor the sufficiency of the evidence supporting any of the counts for which he was convicted. Therefore, the undersigned presumes that the California Court of Appeal's summary of the evidence is accurate and reproduces it here.[2]

**Prosecution Evidence**

> [Petitioner][3] and his girlfriend, Vanessa G., lived together with Vanessa's friend, M.R. In October 2017, [petitioner] and M.R. began a secret affair despite [petitioner]'s continuing relationship with Vanessa. [Petitioner] and M.R. both moved out of the residence around July 2018 and continued their affair without Vanessa's knowledge.
>
> [Petitioner] and M.R. had an argument about the fact that Vanessa, rather than M.R., had purchased bus tickets for [petitioner]'s children to visit from Los Angeles. M.R. testified that she found out from the Greyhound Web site that Vanessa purchased the tickets. She stated that she did not use a password or a confirmation code to get that information.
>
> In mid-August 2018, M.R. loaned [petitioner] her 2002 Ford Taurus. On September 12, 2018, M.R. told [petitioner] on the phone that she wanted it back. She said she would report it stolen if he did not return it. [Petitioner] became angry and said he was "coming up" to talk. M.R. said "no, don't come up here."
>
> [Petitioner] went to M.R.'s house around 11:00 p.m. on September 12, 2018. [Petitioner] let himself into the house and went to M.R.'s bedroom. They began arguing. He called her names, and when she

---

[2] See 28 U.S.C. § 2254(e)(1) (emphasizing that "a determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner rebuts it by clear and convincing evidence).

[3] For clarity sake, the California Court of Appeal's reference to "defendant" has been modified to "petitioner" to reflect the current procedural posture of this case. The changes are indicated in brackets.

got up to leave, he hit her. He closed the door, pushed her on the bed, and hit her with both an open hand and a closed fist. [Petitioner] pushed M.R. onto the bed and placed his hands around M.R.'s neck, squeezing her until she "wasn't able to breathe." Around this time, [petitioner] told M.R. "I'm going to fucking kill you."

M.R. believed that [petitioner] would carry out his threat. M.R. tried to fight back, scratching his face. He choked her until she lost consciousness. When M.R. regained consciousness, [petitioner] was sitting on the floor of her room. [Petitioner] continued calling her names.

That night, [petitioner] broke nearly everything in her room. In an enraged state, [petitioner] broke a television stand after throwing it against the wall. He pulled a fan out of the wall and threw it across the room; he pulled bins from M.R.'s dresser and threw her clothing all over the room; he broke some of her shoes and bras. As [petitioner] destroyed the items in her room, M.R. sat on the bed, crying, and asking him why he was doing this. He told her it was all her fault. [Petitioner] demanded that M.R. give him her phone when he heard a message notification. M.R. refused because she needed her phone in case she would be notified that her pregnant sister went into labor. [Petitioner] told M.R. that if she didn't give him the phone, her unborn niece "wouldn't see past two weeks." [Petitioner] was at M.R.'s house for about three hours. M.R. testified that she was afraid of him "[t]he whole night." From the time that she regained consciousness after he strangled her, M.R. looked for a way to leave.

At some point in the night, [petitioner] pulled M.R.'s hair, ripping a chunk of it out. He heated a barbecue lighter, said, "I'm going to make you remember me," and held the hot lighter to her hand, burning her. [Petitioner] taunted M.R. throughout the night, slapping her on the top of the head with an open hand. He pinned her down on the bed, holding her by the arms so hard that he left bruises. As a result of [petitioner]'s physical assault, M.R. had visible bruising on her arms and neck for several weeks.

M.R. escaped the house by pretending to check the property for a possible trespasser. [Petitioner] left the property in M.R.'s Ford Taurus. M.R. drove to the Jackson Rancheria Casino to talk with L.S. (M.R.'s landlord & roommate). She then drove to a hospital parking lot where she thought about what had happened.

A couple hours after she left her house, M.R. realized that [petitioner] had left his phone in her room. After calling him at his mother's house (where [petitioner] was living at the time), M.R. noted that [petitioner] was no longer enraged. She decided to take his phone to him around 3:00 a.m. When M.R. got to [petitioner]'s mother's house, they discussed what had happened. He started "loving on" M.R., told her that "if [she] didn't get him so mad, he wouldn't react like this." [Petitioner] and M.R. had sex in the garage.

Before M.R. left, [petitioner] pulled out the title to the Ford Taurus, held her by the back of the neck, and told M.R. to sign it over to him.

3

She had kept the title in a safe at her house, and although she never gave the title to [petitioner], he knew where she kept the key to the safe. As [petitioner] continued holding her by the back of the neck, M.R. dated the title, started signing the first letter of her first name, and then decided not to sign it. She dropped the title on the ground and left, going back to her home. She did not take the title with her because "[t]hat would just give him another reason to come after me."

On September 13, [petitioner] asked M.R. to buy his son a video game. She did, and then dropped it off at [petitioner]'s work. On September 24, M.R. picked up [petitioner] from work and he paid her for his half of the telephone bill.

On September 26, M.R. met [petitioner] in a Save Mart parking lot, with plans for [petitioner] to return the phone that M.R. had given him, and M.R. was going to give him his money back from his half of the phone bill. During the exchange, the two began arguing. [Petitioner] held her against the side of her car, squeezing her upper arms hard enough that he left bruises. He also tried to kiss her. M.R. and [petitioner] went to Reno together on September 29, 2018, to attend Street Vibrations. They rented a hotel room in Carson City.

On September 30, 2018, [petitioner] asked M.R. if he could see her. She told him, "I don't need to see you anymore, you don't need to see me anymore, let's just leave it there." M.R. was napping at home when she heard L.S. yelling at someone to get off the property. It turned out to be [petitioner]. L.S. called for M.R., and M.R. went outside. There was glass from M.R.'s car's windows on the ground. M.R. sought a restraining order against [petitioner] on October 3, 2018. She did not mention in her application that [petitioner] had threatened to kill her on September 12.

[Petitioner] had a prior history of domestic violence. In May 2018, petitioner pled no contest to a misdemeanor count of injuring a spouse or cohabitant. That incident involved Vanessa who was photographed by police officers with bruising on her cheek.

**Defense Evidence**

[Petitioner]'s mother testified that she did not notice any scratches on [petitioner]'s face on September 13, 2018.

Vanessa testified that [petitioner] was still her boyfriend, and that he did not have scratches on his face on September 13, 2018. She also testified that she purchased Greyhound bus tickets for [petitioner]'s children to visit, wrote the confirmation down, and gave it to [petitioner]. She was unable to check on the status of the reservations without using a confirmation number. Vanessa also denied that [petitioner] hit her in April 2018, despite reporting it to the police.

Defense investigator Kimberly Barraza testified that she researched the Greyhound Web site and was unable to access any reservation information without both a last name and confirmation number.

4

1  ECF No. 8-10 at 2-5.

2  On direct appeal, the California Court of Appeal affirmed the judgment but struck petitioner's one year prison term enhancement, resulting in a 25 to life sentence. ECF No. 8-10. The California Supreme Court denied a petition for review on October 13, 2021. ECF No. 8-12.

Petitioner filed his § 2254 application in this court on December 20, 2022. ECF No. 1. In his only claim for relief, petitioner contends that the trial court erred by failing to instruct the jury sua sponte on the law of attempted criminal threats as a lesser included offense of the count of making criminal threats. He alleges that this violated his Fifth, Sixth, and Fourteenth Amendment rights as well as Beck v. Alabama, 447 U.S. 625 (1980).

Respondent filed an answer asserting that petitioner's claim for relief does not raise a cognizable federal question because there is no clearly established federal law requiring lesser included offense instructions in non-capital trials. ECF No. 9 at 10-11 (citing Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998)). Moreover, respondent points out that defense counsel did not request a jury instruction on attempted criminal threats in this case. ECF No. 9 at 10. Even assuming that the constitution requires lesser included offense instructions, the evidence did not support giving one for attempted criminal threats. Id. at 11. As a result, the California Court of Appeal's denial of relief on this basis was not unreasonable and therefore does not entitle petitioner to habeas relief. Id.

In his counseled traverse, petitioner "agrees with Respondent that a state trial court's failure to instruct on a lesser included offense in a noncapital case does not, by itself, present a federal constitutional claim." ECF No. 13 at 4 (citing Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam)). However, petitioner argues that, in this case, due process required the trial court to sua sponte instruct the jury on attempted criminal threats because it constituted petitioner's theory of defense. Id. Petitioner argued during closing that the victim was not in sustained fear to support the charge of making criminal threats based on her actions after petitioner left her house that night and in the following days and weeks. ECF No. 13 at 5. Based on this post-offense evidence of a continuing relationship between petitioner and the victim, petitioner submits that the state court's determination that there was not substantial evidence to

1  support an instruction on attempted criminal threats was unreasonable.  ECF No. 13 at 6.

2       **II.**     **AEDPA Standard of Review**

3       To be entitled to federal habeas corpus relief, petitioner must affirmatively establish that the state court decision resolving the claim on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  28 U.S.C. § 2254(d)(1).  The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are distinct, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)], that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

     "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002) (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent may constitute "clearly established Federal law," but circuit law has persuasive value regarding

6

what law is "clearly established" and what constitutes "unreasonable application" of that law. Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044, 1057 (9th Cir. 2004).

Relief is also available under the AEDPA where the state court predicates its adjudication of a claim on an unreasonable factual determination. 28 U.S.C. § 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court. See Cullen v. Pinholster, 563 U.S. 170 (2011). Under § 2254(d)(2), factual findings of a state court are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." "[U]nreasonable" in § 2254(d)(2) is interpreted in the same manner as that word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338 (2006).

If petitioner meets either of the § 2254(d) standards, then the federal habeas court reviews the merits of the constitutional claim "by considering de novo the constitutional issues raised[,]" i.e., without the deference AEDPA otherwise requires. Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008) (en banc). However, in certain circumstances that "second inquiry" will not be necessary if the court's holding on the § 2254(d) standard shows that the de novo constitutional standard "is satisfied as well." Id. at 736.

### III.   Analysis

The parties agree that there is no clearly established federal law requiring a state trial court to instruct the jury on a lesser included offense in a non-capital case. See Beck v. Alabama, 447 U.S. 625 (1980) (holding that a capital jury was required to be instructed on the lesser included offense because "death is different"). Moreover, it has long been established in the Ninth Circuit that the failure of a state court to instruct on a lesser included offense does not present a federal constitutional question and therefore cannot provide a basis for habeas relief. See Bashor v. Riley, 730 F.2d 1228 (9th Cir. 1984). This absence of such clearly established federal law

1  precludes habeas corpus relief in this case. See Carey v. Musladin, 549 U.S. 70, 77 (2006).

2  Even construed as a due process claim based on the denial of his right to a jury instruction
3  on his theory of defense, petitioner is not entitled to habeas relief in this case because the
4  evidence did not require the trial court to sua sponte instruct on attempted criminal threats. See
5  Bashor, 730 F.2d at 1240 (recognizing that a "criminal defendant is also entitled to adequate
6  instructions on his or her theory of defense"). Defense counsel argued in closing that petitioner
7  was not guilty of making criminal threats because the victim was not in sustained fear, as
8  demonstrated by her decision to communicate with petitioner and meet with petitioner in the early
9  morning hours following the incident. See ECF No. 8-2 at 291-293 (Reporter's Transcript).
10 However, the jury necessarily rejected that argument by finding the sustained fear element
11 established beyond a reasonable doubt. The California Court of Appeal denied relief, finding that
12 the victim's testimony established:

> [T]hat she heard [petitioner] threaten her, she understood the threat, she believed that the [petitioner] was capable of carrying out the threat, and she suffered sustained fear of [petitioner] beyond what is momentary, fleeting, or transitory. The victim's testimony about the incident at the house and her subsequent conduct in seeing [petitioner] after the incident at the house is not in direct conflict, and any suggestion that the victim was not in sustained fear during the relevant time period is completely unsupported by any evidence pertaining to that particular issue.

17 ECF No. 8-10 at 9-10. The California Court of Appeal further found the evidence "did not
18 warrant instruction on the lesser included offense because M.R. had already suffered sustained
19 fear for *hours* – a duration clearly sufficient for the element of fear set forth in [Penal Code]
20 section 422." Id. at 11 (emphasis in original). The undersigned has reviewed the trial evidence in
21 this case and finds that—assuming a federal due process right to a jury instruction on the
22 defendant's theory is clearly established—the state court's denial of relief based on a lack of
23 substantial evidence to support the lesser offense of attempted criminal threats was not
24 objectively unreasonable.[4] See, e.g., Solis, 219 F.3d at 929-30 (finding no constitutional error in

---

[4] A federal habeas court looks to the last reasoned state court decision in applying the § 2254(d) standard. See Wilson v. Sellers, 584 U.S. 122 (2018) (adopting the Ylst look-through presumption of silent state court denials of relief even after the decision in Harrington v. Richter, 562 U.S. 86 (2011)); see also Ylst v. Nunnemaker, 501 U.S. 797 (1991). Thus, this court "looks through" the subsequent silent denial by the California Supreme Court and reviews the California Court of Appeal's decision for objective reasonableness under 28 U.S.C. § 2254(d).

8

failure to instruct as to voluntary and involuntary manslaughter at a trial where the petitioner was convicted of murder and the state courts found the evidence implied that petitioner had acted with malice). For these reasons, the undersigned recommends denying petitioner's habeas corpus application.

Accordingly, **IT IS RECOMMENDED** that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 7, 2026

SEAN C. RIORDAN
UNITED STATES MAGISTRATE JUDGE